UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

SHEILAH ROBERTSON

    Plaintiff,   Case No.:

v.   Hon:

Board of Trustees of
MICHIGAN STATE UNIVERSITY

    Defendant.

_____/
Nicholas Roumel (P37056)
NACHT & ROUMEL, P.C.
*Attorney for Plaintiff*
101 N. Main Street, Ste. 555
Ann Arbor, Michigan 48104
(734) 663-7550
nroumel@nachtlaw.com
_____/

# COMPLAINT AND JURY DEMAND

Plaintiff Sheilah Robertson brings this complaint for disability and gender discrimination, and retaliation, arising from her employment and employment termination with Defendant, and in support states the following:

### Parties/Jurisdiction/Venue

1. Plaintiff Dr. Sheilah Robertson presently resides in Gainesville, Florida, but at all relevant times to this suit, she lived in Ingham County, Michigan. She is a female, 59 years old at the time of the filing of this complaint.

2. Defendant Michigan State University is a state of Michigan public university located in East Lansing, Ingham County, Michigan, and the Board of Trustees are their governing body. Collectively, they are referred to hereafter as "MSU."

3. The events giving rise to this lawsuit occurred at MSU, in Ingham County.

4. The jurisdiction of this court is invoked pursuant to Title I of the Americans with Disabilities Act ["ADA," 42 USC §12101 *et seq*], Section 504 of the Rehabilitation Act of 1973 ["Section 504," 29 USC 701 *et seq.*], the Michigan Persons with Disability Civil Rights Act ["PWDCRA," MCL §37.1101 *et seq.*], and Title VII of the Civil Rights Act of 1964, as Amended in 1991 ["Title VII"].

5. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and over state claims pursuant to 28 U.S.C. § 1367.

6. The amount in controversy exceeds $75,000.

7. Jurisdiction to grant injunctive and declaratory equitable relief as well as damages is invoked pursuant to the Acts cited above as well as *Ex Parte Young*, 209 U.S. 123 (1908) pursuant to Plaintiff's request for prospective injunctive relief.

8. On or about May 2, 2017, Dr. Robertson made a complaint to the Equal Employment Opportunity Commission ["EEOC"] against Defendant, alleging, inter alia, disability and gender discrimination, and retaliation.

9. On or about June 12, 2017, she filed an amended complaint, generally alleging the same claims.

10. Dr. Robertson received a "right to sue letter" from the EEOC that was mailed on or about December 5, 2017, and received on December 8, 2017. She files this lawsuit timely within 90 days of receipt of that right to sue letter.

## Factual Allegations

*Dr. Robertson's Employment*

11. Dr. Robertson was hired by MSU as an associate professor of veterinary medicine. She was appointed to serve in the Dept. of Small Animal Clinical Sciences (SACS) effective January 27, 2014. She was contracted at .95 FTE to teach half time, with research at 30% and 20% in committee assignments and other administrative duties. She also committed to publish one manuscript a year as first or senior author. Her salary was set at $140,000. This was a three-year appointment, renewable as of January 27, 2017.

12. Dr. Robertson was eminently qualified. She received a BVMS in Veterinary Medicine from the University of Glasgow, graduating with honors, and four years later earned her PhD from the University of Bristol. Before coming to Michigan State University, she served as a professor (anesthesia and pain management) at the University of Florida (12 years), and an Assistant Director, Animal Welfare (American Veterinary Medical Association). She has numerous specialties and board certifications, including DACVAA and DECVAA (Diplomate of American and European Colleges, Anesthesiology and Analgesia); DACAW (Diplomate, American College of Animal Welfare); DECAWBM (WSEL) (Animal Welfare and Behavioral Medicine, with a sub-specialty in Animal Welfare, Science, Ethics and Law); CVA (Certificate in Veterinary Acupuncture, Chi Institute of Chinese Medicine and Traditional Chinese Veterinary Society); MRCVS (Member, Royal College of Veterinary Surgeons); and has a Maddie's® Graduate Certificate in Shelter Medicine from the University of Florida.

13. Besides having an unblemished career, Dr. Robertson received praise in her formal performance evaluations in 2014 and 2015. Dr. Robertson's 2015 review noted that she "greatly exceeded expectations, especially "in the face of extreme adversity." The "adversity" was reference to staff shortages in her department.

14. At the same time, then-Department Chair Dr. William Horne also encouraged her to submit materials for promotion to full professor. While this was denied in early 2016, there was no criticism of her performance. It was recognized that she "is an excellent anesthesiologist and brings a wealth of expertise to the CVM in this area." The primary reason for denial was her "brief time ... limited time at rank ... short reporting period for her current position ... it was felt that Dr. Robertson was a bit premature in going up for promotion at this time and that more evidence of scholarly performance is necessary to establish a positive trajectory for promotion to Professor."

*Disability Accommodation Requests*

15. As noted above, in 2015, the department experienced staff shortages, and Dr. Robertson vocalized her concerns over the resulting workload.

16. At around this time, in July 2015, Dr. Robertson began working with the MSU Resource Center for People with Disabilities (RCPD) and formally sought accommodations for her disabilities.

17. Dr. Robertson is a two-time breast cancer survivor, and suffers from ulcerative colitis/Crohn's Disease, situational anxiety, and "compassion fatigue" which is also a recognized consequence of overwork in a stressful environment.

18. In November, 2015 Dr. Robertson sent a published article in which she was featured to several administrators in her department, concerning strategies and training to combat compassion fatigue for overworked veterinarians.

19. In the RCPD process, Dr. Robertson requested disability accommodations to limit her backup on-call appointment percentage and duration, and to restrict her work week to 60 hours or to have reciprocal rest if that number were exceeded.

20. These accommodation requests were granted in September, 2015, with many qualifications: there was a promise of a seven day on/seven day off clinic rotation, with some appointments allowed during clinic time, and an effective reduction of back-up on call time to 37% with the provision of locums (temporary workers), rather than the requested 25%. The 60-hour work week was denied, and the seven day on/off clinic rotation was only possible if a Dr. Wilson was available, which was often not the case. In addition, locums could not, based on MSU policy, work more than 5 days in a row, therefore limiting the weekend relief that the 2 permanent anesthesiologists were seeking.

21. Her accommodation request (generally known throughout the department) was portrayed negatively, in a memo dated February 1, 2016, which suggested that Dr. Robertson was getting special treatment, and that Dr. Wilson would shoulder additional work due to the accommodation. Upon receiving the memo, Dr. Wilson told Dr. Robertson, "Well, I suppose you won and I will be picking up the slack!" In reality, Dr. Wilson's workload did not increase appreciably, due to the utilization of locums. Nor did Dr. Robertson's decrease significantly, as she was doing continuing education for the technicians, organizing resident rounds, and anesthesia schedules for faculty, resident and interns, whereas Dr Wilson had no administrative duties within the section.

22. As described further below, Dr. Robertson's disability accommodation request was cited as a negative factor in contributing to staff shortages in the department.

*Defendant Used an Anonymous Survey Against Plaintiff in the Review Process*

23. Sometime in October or November of 2015, the department commissioned a "full service review" with the help of an outside consultant. This was just a few months after Dr. Robertson was appointed service chief of anesthesia (July 22, 2015).

24. It was stated that the review (which included a survey and opportunity for detailed feedback) would be confidential, and only shared with the Dean, the two department chairs, the hospital director, and Drs. Robertson and Wilson. Its purpose was to improve efficiency and service within the department.

25. As one might expect, a confidential survey of this type – where respondents could remain anonymous - was an opportunity for staff members and faculty to vent negatively about a variety of topics and people. Dr. Robertson was not spared; like many of her colleagues, she received criticism from those who worked with her, though she also received positive feedback. Many comments were related to issues going back a year or more, well before Dr. Robertson became service chief of anesthesia, and a a significant portion of all feedback related to the chronic understaffing situation in the department, about which Dr. Robertson had regularly expressed concern.

26. Despite the expressed purpose of the survey/review, the department made the unprecedented decision to use it as the basis for Dr. Robertson's 2016 review. This was done despite Dr. Kruger's acknowledgment to the reappointment committee that it would not be appropriate to use a confidential department-wide survey as a substitute for the formal review or reappointment process.

27. Defendant first disclosed to Dr. Robertson that they were using the survey results against her in the 2016 evaluation process when she met on May 27, 2016 with the acting chair Dr. Kruger, and in his followup letter of June 16, 2016, to discuss her performance.

28. Dr. Robertson's review went on to discuss specific "goals for the upcoming year," indicating to Dr. Robertson that she would be reappointed for another term when her initial contract was set to expire in January, 2017. She felt that she had been through the difficult years of understaffing within the department, and was on the same page as the chair on the major goals of the section and her role in helping to achieve them.

*Defendant Cited Discriminatory and Pretextual Reasons*
*In Not Renewing Dr. Robertson's Contract*

29. On July 22, 2016, just three weeks before Dr. Kruger stepped down as acting chair to allow Dr. Olivier to permanently assume that position, he stunned Plaintiff by giving her formal notice of her non-renewal (effective January 26, 2017).

30. It was unprecedented and illogical to have the outgoing, acting chair make this decision, especially given that the incoming chair was a long-time colleague of Dr. Robertson's who supported her.

31. It was also unprecedented that this decision was made contrary to the Committee on Promotion and Tenure, which recommended Dr. Robertson for a limited reappointment.

32. On information and belief, nobody else recommended for reappointment by this Committee were ever not renewed by the Defendant.

33. The justification for non-renewal was set forth in an internal memorandum from Drs. Kruger (Acting Chair) and Baker (Dean, College of Veterinary Medicine) to the Associate Provost and Associate VP for Academic Human Resources, dated July 18, 2016 for internal consumption, and a memo to Dr. Robertson dated September 6, 2016.

34. First, the memoranda cites poor workplace environment and chronic understaffing contributing to the environment issues. These memos, by implication, blame Dr. Robertson for these issues, but also acknowledge that when another person took over as anesthesia section head, it was "not successful" in improving the workplace environment.

35. Second, the July 18 memo blames the understaffing in part on Dr. Robertson's request for a disability accommodation; it states, **"Contributing to the staffing issue was a directive from the MSU Resource Center for Persons with Disability to reduce Dr. Robertson's percentage commitment to clinic service."** [Emphasis added]

36. Third, the July 18 memo cites a "comprehensive review of the anesthesia section, which consisted of a survey of the section members (faculty and staff), as well as sections that utilize the services of the anesthesia section." This was an external review, and was designed and promoted to be for the improvement of the service, not for the assessment of individual members. There are memos in Dr. Robertson's personnel file questioning the fairness of using these survey results in making a decision about her employment, which the memos acknowledge are unprecedented as they are outside the normal evaluation process that everyone else has. Dr. Robertson was singled out alone in having these survey results affect her employment.

37. Fourth, the Defendant's memos note that although "Dr. Robertson was viewed as a competent anesthesiologist, specific concerns were raised about her performance in leadership ...". Yet it must be stressed that Dr. Robertson's tenure as section head had only been three short months at the time the survey was begun. When she was asked to be service chief she received no training and insufficient support; in fact, she missed the first few meetings of all the service chiefs because the person who calls those meetings did not even know she had been appointed. Under these circumstances she did not have a sufficient opportunity to prove herself as a leader.

38. Fifth, Dr. Robertson was unfairly blamed for recommendations that grew out of the report, including the moratorium on taking new residents. In reality, she has had a positive impact on the residency program. After her arrival, Dr. Robertson took steps to correctly register the program with its specialty college, conduct consistent resident reviews, and provide more didactic work with residents including mock written and oral exams. The 2 residents that Dr. Robertson initially worked with both told her that she made a big difference to the program. Dr. Robertson also got along very well with the current resident, and has supported him with her own faculty funds.

39. Sixth, there are several reasons set forth above, including excellence in job performance, especially in the face of chronic understaffing and Dr. Robertson's disabilities; and recognition of Dr. Robertson and the service's conscientious efforts to improve after the section review.

40. Seventh, there was no notice of the reasons for non-renewal in previous formal reviews, or informal feedback evidenced by memos and email correspondence. Instead, any reference to communication and leadership always looped back to the

acknowledgement of overwork and understaffing, which were rectified after the 2016 review process and other strategic initiatives. Dr. Robertson has also received two merit pay raises with handwritten expressions of appreciation for her hard work; the latter came **after** the notification of non-renewal.

41. Eighth, the "history of poor interpersonal skills" was not documented until 2016. The evidence is strong that it was a temporary issue related to the understaffing factors outlined above (for which she was not responsible and improperly blamed because of her accommodation request). Dr. Robertson admits only that she can at times be blunt when patient safety is at stake, and will not compromise her training in animal welfare and ethics.

42. Ninth, there were false assertions in the September 6 memorandum, including "lack of evidence [she] was developing a sustained funded research program", a goal which by the way had not been mentioned in any formal review, except in an oblique way in 2016 and only in the spirit of encouraging Dr. Robertson to develop such a program in the coming year. It should also be noted that Dr. Robertson was in fact actively working on sustained research effort (airway disease in a breed of dogs called Norwich terriers) with Dr. Bryden Stanley and she is a co-investigator on the grant; $74,496.78 was awarded.

43. Tenth, despite the memo's suggestion that she was underpublished, Dr. Robertson has managed to publish fifteen papers in her tenure, far exceeding the expectation outlined in her original appointment letter. Dr. Robertson also acted as co-editor for the revision of the Lumb & Jones, *Veterinary Anesthesia and Analgesia*, considered the "bible" of veterinary anesthesia.

44. Finally, the non-renewal does not take into account the positive reviews, merit increases, praise from students, and strong support from technicians and others; see, for example, student assessments and the September 16, 2016 letter signed by sixteen colleagues protesting the decision of non-renewal. (A December 28, 2016 student email states that the student "absolutely loved" her class with Dr. Robertson, adding "You were by far the most influential on the path I took, and I think you for that!")

45. Except for Dr. Robertson, on information and belief, no other person in her department has ever had the results of a confidential, anonymous "survey" to serve as the basis for a formal employment review, non-appointment, or termination.

46. Except for Dr. Robertson, on information and belief, no other person in her department has ever been non-appointed where the Committee on Promotion and Tenure recommended reappointment.

47. In Dr. Baker's July 30, 2016 memo, written after the non-appointment was disclosed, he made a reference to Dr. Robertson telling her colleagues that she was not reappointed as "running around and informing everyone that she was not reappointed) in retrospect was predictable. This fits well with our victimization theory." This was a direct, negative reference to Dr. Robertson's accommodation requests and concerns that she was not being fully accommodated.

**Legal Allegations**

*Count I: Americans With Disabilities Act*

48. At all relevant times, Plaintiff was a "qualified individual with a disability" within the meaning of the Americans with Disabilities Act, as she had physical

11

and/or mental impairments that substantially limited her in the performance of major life activities, as set forth above, and/or was perceived as having a disability.

49. Plaintiff was otherwise qualified to perform the essential functions of her job with or without reasonable accommodation, and she did perform satisfactorily.

50. Plaintiff made requests for reasonable accommodations as set forth above, but they were not granted as requested even though such accommodations would not have been unduly burdensome to Defendant.

51. Defendant MSU is an employer within the meaning of the Americans with Disabilities Act.

52. Defendant were well aware of Plaintiff's disability.

53. Defendant failed to accommodate Plaintiff in violation of the ADA, and otherwise subjected Plaintiff to an adverse employment action based on her disability as described above, including when she was not reappointed and ultimately terminated from her position.

54. Defendant also retaliated against Dr. Robertson for making accommodation requests, including but not limited to criticized and blaming her accommodation requests for disruption and discord within the department.

55. As a result, Plaintiff was harmed, and continues to be harmed, in that she has suffered economic and non-economic loss, including but not limited to, lost wages, damage to her professional reputation, emotional distress, outrage and humiliation.

*Count II: Violation of Section 504*

56. Plaintiff's medical conditions qualify as an actual disability for purposes of Section 504 of the Rehabilitative Act of 1973 (Section 504) in that these conditions

substantially limit one or more major life activities. [29 USC § 701, 34 CFR 104.3(j)(1)(i)]

57. Plaintiff was excluded from participation in, and/or denied the benefits of, her employment, solely because of her disabilities, when Defendant denied her the benefits of, and/or subjected her to discrimination regarding her employment, culminating in the termination of her employment.

58. Plaintiff was qualified to perform the essential functions of her job with or without reasonable accommodation.

59. Defendant's decision to discharge Plaintiff was motivated in substantial part by Plaintiff's disability, and/or retaliation for her accommodation requests.

60. As a result, Plaintiff was harmed, and continues to be harmed, in that she has suffered economic and non-economic loss, including but not limited to, lost wages, damage to professional reputation, emotional distress, outrage and humiliation.

*Count III: Michigan's Persons With Disabilities Civil Rights Act*

61. At all times relevant, Plaintiff was an employee under the Michigan Persons with Disability Civil Rights Act, M.C.L.A 37.1101, et seq. [PWDCRA].

62. Defendant MSU was an employer under the PWDCRA.

63. At all times relevant, Plaintiff had a disability within the meaning the PWDCRA and/or was a person who was perceived as having a disability.

64. Plaintiff was able to perform her job with or without reasonable accommodations, and did perform satisfactorily.

65. Plaintiff's disability was unrelated to her ability to perform the duties of her job.

66. Defendant discriminated against Plaintiff on the basis of her disability, and retaliated against her for her accommodation requests, ultimately terminating her.

67. As a result, Plaintiff was harmed, and continues to be harmed, in that she has suffered economic and non-economic loss, including but not limited to, lost wages, damage to professional reputation, emotional distress, outrage and humiliation.

*Count IV - Sex Discrimination - Title VII*

68. The Defendant discriminated against Plaintiff on the basis of her gender, in violation of Title VII of the Civil Rights Act of 1964, 42 USC 2000e-2; 29 CFR 1605.1 *et seq.*

69. Dr. Robertson was disparately treated to similarly situated male colleagues, including but not limited to a Dr. Bohart, who was permitted to not perform clinical services, and all other males who were not subjected to adverse employment actions on the basis of the confidential, anonymous survey or not renewed despite a recommendation from the Committee on Promotion and Tenure.

70. Defendant's termination of Dr. Robertson was because of her gender, or in the alternative, her gender was a motivating factor in her termination.

71. As a result of Defendant's discrimination, Dr. Robertson suffered an adverse employment action, which caused her great damages of both a non-economic and economic nature, as describe herein and below.

*Count V - Sex Discrimination - ELCRA*

72. The Defendant's discrimination against Plaintiff on the basis of her gender was also in violation of the Elliott-Larsen Civil Right Act ("ELCRA"), MCL 37.2202.

14

73. As a result of Defendant's discrimination, Dr. Robertson suffered an adverse employment action, which caused her great damages of both a non-economic and economic nature, as describe herein and below.

## Damages

74. Defendant's actions were done willfully with reckless indifference to Plaintiff's right to be free from illegal discrimination.

75. Defendant's actions directly caused and proximately caused Plaintiff great damages, including embarrassment, humiliation, outrage, pain and suffering, mental distress and significant economic loss.

## Jury Demand

Plaintiff demands a jury trial on all counts.

## Relief Requested

*W H E R E F O R E*, Plaintiff respectfully requests that this Court award her damages in an amount to be determined together with costs, interest, attorney's fees, statutory penalties, prospective, equitable, and injunctive relief, and any other relief that this Honorable Court deems just and proper.

Respectfully submitted,
NACHT & ROUMEL, P.C.

*s/Nicholas Roumel*
Nicholas Roumel (P37056)
Attorney for Plaintiff
101 N. Main Street, Ste. 555
Ann Arbor, MI 48104
(734) 663-7550
March 7, 2018                                      nroumel@nachtlaw.com